# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. CR-11-74-M |
| | ) |
| MELVIN McLAUGHLIN, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Before the Court is defendant Melvin McLaughlin's Motion to Suppress Evidence, filed March 25, 2011. On April 4, 2011, the government filed its response, and the Court conducted a hearing on defendant's motion to suppress. At the hearing, James Michael Stilley, Jr., a Canadian County Deputy Sheriff, and Ranada Gentry, an investigator with the Federal Public Defender's office, testified. Having reviewed the parties' submissions, and having heard the evidence presented, the Court makes its determination.

I.  Factual Background[1]

On January 27, 2011, Deputy Stilley was traveling westbound on Interstate 40 when he observed traffic was backing up due to a pickup truck that was in the left lane traveling below the 70 mph speed limit. Ten vehicles passed this truck on the right. Deputy Stilley stayed behind the truck for approximately two miles, determined that its speed was 64 mph, and decided to stop the vehicle because it was impeding the flow of traffic in violation of Okla. Stat. tit. 47, § 11-309(5). Deputy Stilley then activated his lights and siren, and the truck pulled over and stopped.

Deputy Stilley approached the truck on the passenger side and asked the driver, Ms.

---

[1]This factual background is based upon the evidence presented at the hearing.

Charletta Taylor, for her license and registration. There were two passengers in the truck, defendant who was in the back seat, and Ms. Avery-Martin who was in the front passenger seat. As Ms. Taylor was retrieving her license, defendant leaned forward, retrieved the vehicle's registration, and handed his identification to Deputy Stilley as well. Deputy Stilley asked who the owner of the truck was, and defendant stated that his cousin was the owner. Deputy Stilley then asked Ms. Taylor to accompany him to the patrol car so that he could explain the traffic violation to her. While at the passenger side of the truck, Deputy Stilley could smell an odor of burnt marijuana.

While inside the patrol car, Deputy Stilley informed Ms. Taylor of the violation that occurred, and Ms. Taylor replied that she did not know that was the law and apologized for the violation. Deputy Stilley then responded that he was as a courtesy just going to issue a written warning. Deputy Stilley then asked Ms. Taylor where they were going. Ms. Taylor stated that they were trying to get to Albuquerque and then were going to Los Angeles. Deputy Stilley then asked her what she was going to do in Los Angeles, and she responded that she was going to visit her aunt. Deputy Stilley then radioed Ms. Taylor's and defendant's information to dispatch to check the validity of the licenses and for outstanding warrants. Deputy Stilley testified that Ms. Taylor was acting extremely nervous during this time – she was breathing heavy and her carotid artery was bulging – and that her nervousness did not subside when he reiterated that he was just writing her a warning.

Deputy Stilley then asked Ms. Taylor who she was traveling with, and she replied her cousin and god sister. Ms. Taylor further explained that her aunt was sick, she had sclerosis of the liver and was waiting for a liver transplant. Ms. Taylor also explained that her baby's father owned the truck. Deputy Stilley then exited his patrol car and approached defendant and Ms. Avery-Martin and asked

2

defendant where they were headed. Defendant said Albuquerque and Los Angeles to visit family, an aunt and a grandmother. Deputy Stilley asked if anyone in the family was sick or in poor health, and defendant replied no. Deputy Stilly also asked about the owner of the vehicle, and defendant stated that the owner was coming to Los Angeles later. Deputy Stilley then began to walk back to his patrol car, but defendant continued to ask questions and talk. Deputy Stilley then observed there was no luggage in the bed of the truck or in the back seat and asked defendant about this. Defendant then picked up a small bag that contained a bra and a small shirt and stated here is the luggage and stated that he was going to buy clothes in Los Angeles because clothes were cheaper there.

Deputy Stilley then returned to his patrol car. At approximately 15 minutes and 40 seconds into the stop, dispatch confirmed that Ms. Taylor's license was valid and that there were no outstanding warrants. Deputy Stilley then completed the courtesy warning and had Ms. Taylor sign it. Deputy Stilley testified that Ms. Taylor's severe nervousness continued throughout the entire time of the stop.

Deputy Stilley then asked Ms. Taylor why the owner of the truck had not made the trip, and Ms. Taylor stated that he was working and was not joining them in Los Angeles. Deputy Stilley then advised Ms. Taylor that based upon the inconsistencies between Ms. Taylor's answers and defendant's answers, he had reason to believe they were involved in some type of criminal activity. Deputy Stilley then asked for an explanation for all the inconsistencies. Ms. Taylor said where she was going and what she was doing was her business and not defendant's. Deputy Stilley then re-approached the truck and asked Ms. Avery-Martin to get out of the vehicle and speak with him. As he did this, he noticed defendant was in the back seat engaged in a phone conversation with a cell phone held up to each ear. Deputy Stilley asked Ms. Avery-Martin about their travel plans and

3

asked whether the owner of the vehicle would be joining them. Ms. Avery-Martin stated that the owner was coming down, but she was not sure if Ms. Taylor knew, and she stated that she didn't know if any of the relatives Ms. Taylor was visiting were sick, that Ms. Avery-Martin was just riding with them.

Deputy Stilley then asked defendant to exit the vehicle while Ms. Avery-Martin returned inside. Deputy Stilley asked defendant about the inconsistent stories, and defendant once again stated that the owner of the truck was coming out to Los Angeles to join them. Deputy Stilley then asked defendant if there was anything illegal in the truck, including drugs, guns, or large amounts of money. Defendant stated no and that Deputy Stilley could check it. Deputy Stilley's partner Deputy Glass had arrived by that time, and Deputy Stilley put defendant in Deputy Glass' patrol car.

Deputy Stilley returned to his vehicle and asked Ms. Taylor again about the owner of the truck. At this point, Ms. Taylor said that she had lied about the sick aunt because she wanted it to seem like they were going to Los Angeles for a real reason. Deputy Stilley then asked Ms. Taylor if there was anything illegal in the truck, and she replied no. Deputy Stilley asked for consent to search the truck, and Ms. Taylor agreed to the search. Deputy Stilley also asked Ms. Avery-Martin if she would consent to a search of her belongings, and she also agreed. A search of the truck was then conducted, and at no point during the search did either Ms. Taylor, Ms. Avery-Martin or defendant indicate that he or she wanted the search to stop.

II.  Discussion

Defendant moves this Court to suppress all physical evidence, including oral statements and fruits thereof, obtained as a result of the search and seizure incident to the traffic stop on January 27, 2011. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, even though

4

the purpose of the stop is limited and the resulting detention quite brief." *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (internal quotations and citation omitted). A routine traffic stop is analyzed under the principles developed for investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* To determine the reasonableness of an investigative detention, a court engages in a two-part inquiry: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.*

> An initial traffic stop is valid under the Fourth Amendment not only if based on an observed traffic violation, but also if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether the particular officer had reasonable suspicion that the particular motorist violated any . . . of the multitude of applicable traffic and equipment regulations of the jurisdiction.

*Id.* at 1348 (internal quotations and citations omitted). Further, "[a]n officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop." *United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004).

Having heard the evidence presented,[2] the Court finds that the initial traffic stop of the truck was valid under the Fourth Amendment. Specifically, the Court finds that Deputy Stilley had a reasonable articulable suspicion that the driver of the truck was impeding the flow of traffic in violation of Okla. Stat. tit. 47, § 11-309(5)[3] and was, therefore, justified in stopping the truck.

---

[2] The Court would specifically find that Deputy Stilley and Ms. Gentry are credible witnesses.

[3] Okla. Stat. tit. 47, § 11-309(5) provides:
Upon a roadway which is divided into four or more lanes, a vehicle

5

A routine traffic stop "usually must last no longer than is necessary to effectuate the purpose of the stop and the scope of the detention must be carefully tailored to its underlying justification." *Id.* at 1349. An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. *Id.* "Lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." *Hunnicutt*, 135 F.3d at 1349 (internal citations omitted).

To have "reasonable suspicion" of criminal activity, "the officer must acquire a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Villa-Chaparro*, 115 F.3d 797, 801-02 (10th Cir. 1997). An officer's "inchoate and unparticularized suspicion or 'hunch'" is insufficient to give rise to reasonable suspicion. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994). To determine whether reasonable suspicion exists, a court examines the totality of the circumstances. *Id.* "Common sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions." *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997) (internal citations omitted). Inconsistencies in information given to the officer

---

> shall not impede the normal flow of traffic by driving in the left lane; provided, however, this paragraph shall not prohibit driving in a lane other than the right-hand lane when traffic conditions or flow, or both, or road configuration, such as the potential of merging traffic, require the use of lanes other than the right-hand lane to maintain safe traffic conditions.

during the traffic stop can give rise to reasonable suspicion of criminal activity. *Id.* at 947.

Having heard the evidence presented, the Court finds that the initial traffic stop was reasonable based on the length of the detention[4] and the manner in which it was carried out. The Court further finds that Deputy Stilley had developed an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring to lawfully detain the occupants of the truck for further questioning. Specifically, the Court finds that based upon the smell of burnt marijuana, the extreme nervousness of Ms. Taylor, and the inconsistent stories from the occupants, Deputy Stilley had a particularized and objective basis for suspecting criminal activity was afoot.

Finally, "[w]hether a consent to search that does not follow a Fourth Amendment violation was voluntary is a question of fact to be determined from the totality of the circumstances. The government bears the burden of proving the consent was voluntary. The government must show there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996).

"In determining whether a consent to search was free from coercion, a court should consider, inter alia, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances. An officer's request for consent to search does not taint an otherwise consensual encounter as long as the police do not convey a message that compliance with their request is required." *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir.

---

[4] The initial traffic stop lasted approximately 15 minutes and 40 seconds, which falls within the average length of time for a traffic stop.

1998) (internal quotations and citations omitted).

Having heard the evidence presented, the Court finds that based upon the totality of the circumstances, the consents to search given by all three occupants of the truck were voluntary. Deputy Stilley did not brandish his weapon and did not touch the occupants or otherwise use aggressive language or tone of voice. Further, there was no evidence of any duress or coercion, express or implied. Additionally, the Court finds that the consents were unequivocal and specific and were freely and intelligently given. Finally, the Court finds that Deputy Stilley did not exceed the scope of the consents given.

III.  Conclusion

Accordingly, for the reasons set forth above, the Court DENIES defendant's Motion to Suppress Evidence [docket no. 22].

**IT IS SO ORDERED this 6th day of April, 2011.**

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE